UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAMES HOGAN and ANDREW J.J. WOLF, | Case No. 1:15-cv-00308-BLW |
| Plaintiffs, | **INITIAL REVIEW ORDER** |
| v. | |
| IDAHO DEPARTMENT OF CORRECTION; KEVIN KEMPF; JEFF ZMUDA; SHANNON CLUNEY; SHANE EVANS; HOWARD YORDY; GARRETT COBURN; LEROY PENEKU; JESSYCA TYLER; JENANETTE HUNTER; JEFF KIRKMAN; DAN COPELAND; JOSH TEWALT; FSO HOUSTON; FSO BONNER; and KATHLEEN WILLSON, | |
| Defendants. | |

        The Clerk of Court conditionally filed the Complaint of Plaintiffs James Hogan

and Andrew J.J. Wolf as a result of Plaintiffs' status as inmates and their in forma

pauperis requests. The Court now reviews the Complaint to determine whether it or any

of the claims contained therein should be summarily dismissed under 28 U.S.C. §§ 1915

**INITIAL REVIEW ORDER - 1**

and 1915A. Having reviewed the record, and otherwise being fully informed, the Court

enters the following Order directing Plaintiffs to file an amended complaint if they intend

to proceed with this case.

## REVIEW OF COMPLAINT

### 1.    Factual Allegations

Plaintiffs are prisoners in the custody of the Idaho Department of Correction

(IDOC), currently incarcerated at Idaho State Correctional Institution (ISCI). ISCI

follows IDOC policies regarding inmate meals and religious dietary restrictions. IDOC

provides a "mainline diet" for the majority of inmates. IDOC also provides four

"selective diets" that inmates can choose: (1) a lacto-ovo diet, which contains animal

products but no meat; (2) a vegan diet, which contains no animal products; (3) a healthy

choice diet, which is low in fat and sugar; and (4) a non-pork diet, which contains animal

products other than pork. (Compl., Dkt 15, ¶ 30.) It appears that inmates may choose a

selective diet by asking a chaplain or by applying to the Religious Activities Oversight

Committee (RAOC) at ISCI.

Plaintiff Hogan, a practicing Muslim, has expressed a desire to be served a Halal

diet, which he contends must comply with the following dietary restrictions:

> [T]he food must derive from religiously acceptable sources,
> be stored in Halal containers, prepared in a particular manner,
> and served on tableware that has not contacted Non-Halal
> food. In addition, meat and dairy products may not be mixed.
> To be Halal a meat must be pork-free and slaughtered to
> Koranic Law, which is that similar to the way Kosher Meats
> are prepared.

**INITIAL REVIEW ORDER - 2**

(*Id.* ¶ 34-35.) Plaintiff Hogan believes that consuming food that violates these dietary restrictions defiles his body and is incompatible with the exercise of his religious beliefs.

According to Plaintiffs, "Plaintiff Hogan's only option available to him at this time is to chose [sic] the non-pork diet from the 'Selective Diets' that IDOC makes available but is not Halal." (*Id.* ¶ 36.) Hogan's application for a non-pork selective diet was approved by prison officials.

On October 4, 2014, Plaintiff Hogan "requested a non-pork at the diet window" but was instructed, by a food service employee, "to take a mainline tray for no pork products were being served" in that particular meal. (*Id.* ¶ 52.) Defendant Houston, unaware that Hogan had been instructed to take a mainline tray for that particular meal, observed Plaintiff Hogan with his mainline tray. In accordance with IDOC's policy of removing inmates from selective diets for noncompliance with that diet (*id.* ¶ 57), Defendant Houston removed Plaintiff Hogan from the non-pork diet. Defendant Coburn later informed Hogan that, because of this noncompliance, he was ineligible to reapply for the non-pork diet until January 2015. (*Id.*)

Hogan explained to several Defendants that he was taken off the selective non-pork diet as a direct result of his being instructed by a food service employee to take a mainline tray. This explanation appeared to be sufficient, as Defendant Hunter responded to Plaintiff Hogan that "the matter was corrected for the month of October," and told Hogan that he "would have to ask for non-pork meals at all meals when he came to eat." (*Id.* ¶ 55.) Hogan therefore resubmitted his selective diet request, and was informed again, this time by Defendant Willson, that he could not resubmit his request until

January because he had been removed from the non-pork diet for noncompliance. Hogan again explained the problem, and "Defendant Willson finally corrected the matter rather than deny it for the months of October, November and December." (*Id.*)

Plaintiff Wolf, a practicing Catholic, has expressed a desire to be served with a Lenten meal during Lent, which he contends must comply with the following dietary restrictions:

> Under Plaintiff Wolf's Catholic Faith, the Fourth Precept to the Catholic Church sets for the days of fasting on days of abstinence. A day of abstinence is on Fridays which he is not allowed the use of flesh meat, including meat soup and gravy. Flesh meat is the flesh of warm-blooded animals, including birds and fowl's. Fish, snails, frogs, oysters, shrimps and crabs may be eaten on abstinence days, as well as milk, butter, cheese, eggs. Lard and the fact of any animal may be used in cooking and seasoning. On an abstinence day unless it is also a feast day, only quality, not the quantity, of food is regulated.

(*Id.* ¶ 48.) Plaintiff Wolf contends that he must follow Lenten restrictions because those restrictions "ensure[] the times of [asceticism] and penance that prepares [sic] Plaintiff Wolf for the liturgical feasts; they help him acquire freedom of heart and mastery over instincts." (Id. ¶ 63.)

In accordance with Plaintiff Wolf's religious beliefs, he sent a concern form to an ISCI chaplain in October 2014, requesting a Lenten meal on Ash Wednesday and each of the six Fridays during Lent. Wolf later filed a grievance on this issue. He was told that a Lenten diet was not one of the dietary options and that if Plaintiff Wolf wished to eat a Lenten meal, he would have to choose a selective diet that accommodated that desire. (*Id.* ¶¶43-45.) Wolf has acknowledged that either the lacto-ovo diet or the vegan diet would

comply with Lenten dietary restrictions. (*Id*. ¶ 42.) However, Plaintiff Wolf now states in this Complaint that "none of the meal options at ISCI meet Wolf's religious needs." (*Id*. ¶ 49.)

      After Wolf filed a grievance appeal, Defendant Yordy responded by stating,

> We will attempt to make a partial accommodation to your request. You may eat Mainline [until Lent] but you must declare beforehand which of the other 4 [selective dietary] meals you will be eating for Ash Wednesday and the seven Friday's. It can be a combination of the give meals for the eight days but we can't make a specific meal every Friday, such as Fish. . . . You and likely others making the same request are not going to be able to simply decide on those days which of the other four you want. Food service has a plan for a specific number of meals for each diet and prepare accordingly.

(*Id*. ¶ 46.) Plaintiff Wolf has not alleged that this accommodation was later revoked or denied.

      Wolf was not satisfied with this accommodation; instead, he believed that he should be provided a fish meal on the Lenten fast days, rather than having to choose the lacto-ovo or vegan diet on those days. Wolf's subsequent attempts "to have fish served each Friday for dinner" were unsuccessful. Plaintiff Wolf claims that Defendants removed fish from the menu "after Wolf had pointed out that there was no substantive burden in serving fish each Friday for it was already on the Menu." (*Id*. ¶ 47.)

      Plaintiffs bring First and Fourteenth Amendment claims under 42 U.S.C. § 1983, the federal civil rights statute. Plaintiffs also assert violations of the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq*., as well as the

Idaho Free Exercise of Religion Protected Act (FERPA), Idaho Code § 73-401 *et seq.*[1]

They assert claims based on the following circumstances: (1) the IDOC's failure to provide a *specific* Halal diet and a *specific* Catholic Lenten diet[2] rather than continue their current policy, which offers a range of selective diet options, some of which would not violate Catholic or Halal precepts; (2) Plaintiff Hogan's removal for an unspecified period of time from the non-pork diet because he took a mainline tray on a day when no pork was being served, after being instructed to do so by a food service worker; and (3) the removal of fish from the IDOC's menu options, allegedly in retaliation for Plaintiff's request for a Lenten diet that included fish. (Compl., Dkt. 5, at 20-21, 14.)

Plaintiffs seek monetary, declaratory, and injunctive relief.

## 2.      Standard of Law for Summary Dismissal

The Court is required to review complaints filed in forma pauperis, or complaints filed by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity, to determine whether summary dismissal is appropriate. The Court must dismiss a complaint or any portion thereof that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(d)(2) & 1915A(b).

---

[1]      Plaintiffs also claim that IDOC's failure to provide Halal or Lenten diets violates an injunction issued in another case. (Dkt. 15 at 7-8.) However, if Plaintiffs intend to challenge IDOC's compliance with such an order, they must do so in that other case.

[2]      Plaintiffs assert that Defendants should be required to offer kosher meals as well. (See Dkt. 5 at 20.) However, Plaintiffs have not alleged that their religions require kosher meals. The allegations of the Complaint show that Plaintiffs' beliefs pertain to Catholic and Halal dietary restrictions, not Jewish dietary restrictions. Thus, the Complaint does not state a plausible claim based on the denial of a kosher diet.

**INITIAL REVIEW ORDER - 6**

A complaint fails to state a claim for relief under Rule 8 of the Federal Rules of Civil Procedure if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In other words, although Rule 8 "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," the complaint has not stated a claim for relief that is plausible on its face. *Id.* (internal quotation marks omitted).

Although a plaintiff must provide sufficient facts to survive screening under 28 U.S.C. §§ 1915 and 1915A, providing too much in the complaint can also be fatal to a plaintiff's case. Dismissal is appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of Los Angeles,* 119 F.3d 778, 783, n. 1 (9th Cir. 1997) (stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other . . . evidence on summary judgment establishes the identical facts"). "Although Federal Rule of Civil Procedure 8(a)(2) requires only that a plaintiff's complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, by going beyond the bare minimum, a plaintiff may plead herself out of court." *Warzon v. Drew,* 60 F.3d 1234, 1239 (7th Cir. 1995) (internal quotation marks omitted).

**INITIAL REVIEW ORDER - 7**

To state a valid claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Prison officials generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). This causal connection "can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (internal quotation marks, citation, and alterations omitted).

**3.      First Amendment Free Exercise Claims**

      *A.      Standards of Law*

The First Amendment Free Exercise Clause—applicable to the States through the Fourteenth Amendment's Due Process Clause—absolutely protects the right to believe in a religion. It does not, however, absolutely protect all conduct associated with a religion. *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940). Inmates retain their free exercise

**INITIAL REVIEW ORDER - 8**

of religion rights in prison. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). An inmate who is an adherent of a minority religion must be afforded a "reasonable opportunity of pursuing [her] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). A prison need not, however, provide "identical facilities or personnel" for "every religious sect or group within a prison." Further, a "special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Id.* at 322 n.2.

To serve as a basis for a viable claim challenging a prison restriction under the Free Exercise Clause, an inmate's belief must be both sincerely held and rooted in religious belief. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008); *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). However, *de minimis*—or minor—burdens on the free exercise of religion are not of a constitutional dimension, even if the belief upon which the exercise is based is sincerely held and rooted in religious belief. *See, e.g.*, *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (the unavailability of a non-pork tray for inmate at 3 meals out of 810 does not constitute more than a *de minimis* burden on inmate's free exercise of religion). A prison's occasional failure to accommodate a religious practice does not violate the Free Exercise Clause where there is no evidence that the failures were caused by "anything other than institutional shortage." *Id.* Similarly, a temporary delay in accommodating religious practice does not violate the First Amendment when caused by ordinary administrative or institutional delay. *See Tapp*

*v. Stanley*, 2008 WL 4934592, at *7 (W.D.N.Y. Nov. 17, 2008) (unpublished) (holding that a 3-month delay in providing a prisoner with a religious meal did not substantially burden the prisoner's sincerely-held religious beliefs where the delay was "caused by ordinary administrative delay").

Challenges to prison restrictions that are alleged "to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 125 (1977) (citation omitted). What constitutes a reasonable opportunity for religious exercise, therefore, must be evaluated within the context of a prison's need for security, among other legitimate goals. *O'Lone*, 482 U.S. at 350-53 (1987) (holding that a prison's policy of not allowing Muslim inmates on work detail to return to the prison to attend Jumu'ah, a group worship service, did not violate the Constitution).

As long as a restriction on an inmate's religious practice "is reasonably related to legitimate penological interests," that restriction is valid. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Factors to be considered in this reasonableness inquiry include (1) whether there is a logical connection between the governmental interest and the particular policy or decision at issue; (2) whether "alternative means of exercising the right remain open to prison inmates"; (3) the impact that accommodating a prisoner's religious practice would have on "other inmates, on prison personnel, and on allocation of prison resources generally," *O'Lone*, 482 U.S. at 350-52 (internal quotation marks and alterations

**INITIAL REVIEW ORDER - 10**

omitted); and (4) whether there is an absence of ready alternatives, which constitutes "evidence of the reasonableness of a prison regulation," *Turner*, 582 U.S. at 90.

### B.   Discussion

Plaintiffs' allegations do not state a plausible claim under the First Amendment's Free Exercise Clause. First, with respect to Plaintiffs' claim that the IDOC should be required to specifically provide a Catholic and a Halal diet, there is nothing in the Complaint plausibly suggesting that the IDOC's action is unconstitutional. At least one of these diets—the vegan diet—contains only foods that would not violate the Catholic or Halal dietary restrictions described in Plaintiffs' Complaint. Because Plaintiffs can choose a diet plan that does not include any food that would violate their religious dietary laws, they have not plausibly alleged that they are substantially burdened by the failure of IDOC to offer a specific, separately-prepared Catholic or Halal meal. Plaintiffs are not entitled to demand meat in a religious diet—they are perfectly able to choose a vegan diet (or a non-pork or lacto-ovo diet) that complies with their religious dietary restrictions. IDOC's decision to offer the selective diets instead of specific religious meals prepared according to each inmate's religious beliefs is reasonably related to the legitimate penological purpose of meeting and maintaining each prisoner's nutritional needs, while still running an efficient institution. The First Amendment does not require prison officials to offer each prisoner his own religious meal option, tailored to that particular prisoner's expressed religious belief.

Further, that Plaintiff Hogan was removed from the non-pork diet for a limited period of time does not state a colorable free exercise claim. First, Plaintiffs do not state

**INITIAL REVIEW ORDER - 11**

for how long Plaintiff Hogan was removed from the selective diet. It is clear from the Complaint that Plaintiff Hogan was reinstated on his non-pork diet once Defendants learned that his apparent noncompliance with the selective diet—taking a mainline tray—was in response to an instruction of a food service worker. (Dkt. 15 at 52-55.) It is true that the reinstatement took an unspecified period of time, and that Plaintiff had to explain the situation several times. However, this delay in reinstating the diet was caused by ordinary institutional factors inherent in running a large prison.

Further, even if Plaintiff Hogan could show that his free exercise rights were substantially burdened by his temporary removal from the selective diet program, the IDOC policy of removing a prisoner from a religious diet if he is observed violating that diet is reasonably related to the legitimate penological purpose of ensuring that selective meals are provided only to those inmates who sincerely believe in the necessity of such a diet. Plaintiff Hogan's removal from the non-pork diet, which was based on his taking a mainline tray at the instruction of a food service worker, was made pursuant to policy, and Defendants rectified the issue (other than a short-term deviation most likely based on simple miscommunication or misplacement of paperwork) once they were made aware of the situation. *See Iqbal*, 556 U.S. at 682 (holding that, as opposed to an unconstitutional action, an "obvious alternative explanation" for an official's conduct renders a constitutional claim implausible) (internal quotation marks omitted). "[I]solated acts of negligence" in providing a prisoner with a religious diet are simply insufficient to establish a free exercise claim. *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009).

**INITIAL REVIEW ORDER - 12**

4.    **RLUIPA Claims**

    A.    ***Standards of Law***

The First Amendment is not the only source of religious protection within a prison. The RLUIPA provides, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person[] (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA applies to entities receiving federal financial assistance. *Id.* at (b)(1). By accepting federal funds, however, states do not waive sovereign immunity to suits for money damages under RLUIPA. *Sossamon v. Texas*, 131 S. Ct. 1651, 1655 (2011). Further, although the statute provides for injunctive relief, RLUIPA does not allow for monetary damages against individuals. *Wood v. Yordy*, 753 F.3d 899, 902-04 (9th Cir. 2014); *see also Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("RLUIPA does not authorize suits for damages against state officials in their individual capacities because individual state officials are not recipients of federal funding and nothing in the statute suggests any congressional intent to hold them individually liable.").

Under RLUIPA, the inmate bears the initial burden of showing that the governmental action constitutes a substantial burden on the exercise of the inmate's religious beliefs. *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). For an official's action to constitute a substantial burden on an inmate's religious exercise, it

**INITIAL REVIEW ORDER - 13**

"must impose a significantly great restriction or onus upon such exercise." *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). In determining whether an inmate's religious exercise is substantially burdened, a court may not inquire "into whether a particular belief is 'central' to a prisoner's religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (quoting 42 U.S.C. § 2000cc-5(7)(A)). However, "the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Id.*

If the inmate establishes "the prima facie existence" of a substantial burden on the exercise of the inmate's religion, then the burden shifts to prison officials "to prove that [the] substantial burden on [the inmate's] exercise of his religious beliefs is *both* 'in furtherance of a compelling governmental interest' *and* the 'least restrictive means of furthering that compelling governmental interest.'" *Warsoldier*, 418 F.3d at 995 (quoting 42 U.S.C. § 2000cc-1(a); § 2000cc-2(b)). "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party. If a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (internal citations and quotation marks omitted). Prison officials or a state department of correction "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999.

**INITIAL REVIEW ORDER - 14**

Although RLUIPA is to be construed broadly in favor of protecting an inmate's religious rights, *id.*, the statute does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). A prisoner's requests for religious accommodation must not override other significant interests within a prison setting. "Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 726. In the words of the Supreme Court, "context matters." *Id.* at 723 (quotation marks and alteration omitted).

Finally, RLUIPA does not provide a remedy for negligent conduct, even if that conduct substantially burdens an inmate's exercise of his religious beliefs. *Lovelace v. Lee*, 472 F.3d 174, 196 (4th Cir. 2006.)

### B.     Discussion

Plaintiffs have not stated plausible RLUIPA claims for the same reason as their free exercise claims: they have not established that their religious exercise is substantially burdened by having to choose from the selective diet options rather than be provided a specific Halal meal or a specific Catholic Lenten meal. In *Watkins v. Shabazz*, the Ninth Circuit held that a prison did not violate RLUIPA by failing to provide a Halal diet to a religious inmate because the prison offered "two alternatives to eating non-Halal meat: to eat the nutritionally equivalent meat substitute provided by the prison, or to find an outside religious organization to contract with the prison to provide Halal meat." 180 F.

App'x 773, 775 (9th Cir. 2006) (unpublished). Because the inmate did not establish that these options were unreasonable, the prison could not be held liable under RLUIPA.

Here, as Plaintiffs acknowledge, the IDOC offers inmates five dietary options: the mainline diet and four alternative diets. The current allegations in the Complaint appear to establish that (1) the vegan diet and the non-pork diet both contain only foods that would not violate Halal requirements, and (2) the vegan diet and the lacto-ovo diet both contain only foods that would not violate Lenten requirements. At least one diet—the vegan diet—would unquestionably satisfy both Halal and Lenten dietary requirements because that diet contains no meat or animal products.

Further, Plaintiff Hogan has not stated a plausible RLUIPA claim with respect to his temporary removal from the non-pork diet because the allegations show, at the most, that some Defendants might have been negligent in realizing (or remembering) that Hogan's apparent noncompliance resulted from an instruction by a food service employee, or in updating their files frequently enough that Plaintiff Hogan's mistaken removal from the diet could be quickly verified. It does not show, however, that any Defendant "acted with the requisite degree of culpability to be held liable in their individual capacities under RLUIPA." *Lovelace*, 472 F.3d at 196.

## 5.    FERPA Claims

Plaintiffs also assert claims under FERPA, Idaho's equivalent of the federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq*. "While Idaho has little case law interpreting the FERPA, the legislative history of the statute makes it clear that in adopting the statute the Idaho legislature intended to adopt the 'compelling

**INITIAL REVIEW ORDER - 16**

interest test' contained in" the RFRA. *State v. White*, 271 P.3d 1217, 1220 (Idaho Ct.

App. 2011). The RFRA is judged by the same legal standards as the RLUIPA. *See*

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 436 (2006).

Therefore, Plaintiffs' FERPA claims are governed by RLUIPA standards.

Because Plaintiffs have failed to state plausible RLUIPA claims against

Defendants, they have also failed to state plausible FERPA claims. Moreover, there is no

independent basis for this Court's jurisdiction over Plaintiffs' Idaho state FERPA claims.

Unless Plaintiffs can state a colorable federal claim in this lawsuit, their FERPA claims

are subject to dismissal for lack of jurisdiction. *See* 28 U.S.C. § 1367(c).

**6.    First Amendment Retaliation Claim**

A First Amendment retaliation claim must allege the following: "(1) An assertion

that a state actor took some adverse action against an inmate (2) because of (3) that

prisoner's protected conduct, . . . that such action (4) chilled the inmate's exercise of his

First Amendment rights, and (5) the action did not reasonably advance a legitimate

correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote

omitted). Although a "chilling effect on First Amendment rights" is enough to state an

injury, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001), "bare allegations of

arbitrary retaliation" are insufficient to state a retaliation claim. *Rizzo v. Dawson*, 778

F.2d 527, 532 n.4 (9th Cir. 1985). "A prisoner suing prison officials under section 1983

for retaliation must allege that he was retaliated against for exercising his constitutional

rights and that the retaliatory action does not advance legitimate penological goals, such

as preserving institutional order and discipline." *Barnett v. Centoni*, 31 F.3d 813, 815-16

(9th Cir. 1994) (per curiam); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").

Although the timing of an official's action can constitute circumstantial evidence of retaliation, there must generally be something more than timing to support an inference of retaliatory intent. *See Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995). Retaliation is not established simply by showing adverse activity by the defendant *after* protected speech; the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000).

Not every retaliatory act taken by an official can be considered an adverse action that chills the exercise of protected speech. The proper inquiry in determining whether a plaintiff has stated a viable retaliation claim "asks whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotation marks omitted). If it would not, then "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted). *See also Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) ("The [*de minimis*] standard achieves the proper balance between the need to recognize valid retaliation claims and the danger of federal courts embroiling themselves in every disciplinary act that occurs in state penal institutions.") (internal quotation marks and alteration omitted); *ACLU of Maryland, Inc. v. Wicomico County*, 999 F.2d 780, 786 n.6 (4th Cir. 1993) (per curiam) ("[T]hese § 1983

plaintiffs suffered no more than a *de minimis* inconvenience and . . . , on the facts of this case, such inconvenience does not constitute cognizable retaliation under the First Amendment.").

Plaintiff Wolf has not sufficiently alleged that any Defendant acted with a retaliatory intent when IDOC removed fish from its menu. Even though this action occurred after Wolf requested a Lenten diet that included fish, mere timing is insufficient to establish a retaliation claim. See *Huskey*, 204 F.3d at 899. Nothing in the Complaint suggests that the individual who made the decision to stop serving fish was motivated by Plaintiff's use of the concern form and grievance process. Moreover, Plaintiffs' allegations show unequivocally that Defendants *granted* Plaintiff Wolf—and any other Catholics who expressed an interest—the ability to eat a vegan or lacto-ovo meal on Ash Wednesday and during all of the Fridays during Lent. (Compl. ¶ 46.) For these reasons, Plaintiffs' current allegations do not state a plausible retaliation claim.

### 7.   Equal Protection Claims

"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal citation and quotation marks omitted).

Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike" by governmental entities. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). However, "[t]he Constitution does not require things which are different

in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940). Equal protection claims alleging disparate treatment or classifications generally are subject to a heightened standard of scrutiny if they involve a "suspect" or "quasi-suspect" class, such as race, national origin, or sex, or when they involve a burden on the exercise of fundamental personal rights protected by the Constitution. *See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). Otherwise, equal protection claims are subject to a rational basis inquiry. *See Heller v. Doe*, 509 U.S. 312, 319-20 (1993).

Because Plaintiffs are prisoners and have not alleged that they are members of a suspect or quasi-suspect class, their Equal Protection claims are subject to a rational basis analysis. *Id.*; *Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."); *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) ("In the prison context, . . . even fundamental rights such as the right to equal protection are judged by a standard of reasonableness—specifically, whether the actions of prison officials are reasonably related to legitimate penological interests." (quotation omitted)). Therefore, Plaintiffs' equal protection claims can succeed only if the Defendants' action is "patently arbitrary and bears no rational relationship to a legitimate governmental interest." *Vermouth v. Corrothers*, 827 F.2d 599, 602 (9th Cir. 1987).

State action is presumed constitutional and "will not be set aside if any set of facts reasonably may be conceived to justify it." *More v. Farrier*, 984 F.2d 269, 271 (9th Cir. 1993). Absent evidence of invidious discrimination, the federal courts should defer to the

**INITIAL REVIEW ORDER - 20**

judgment of prison officials. *Id.* at 272; *see also Youngbear v. Thalacker*, 174 F. Supp. 2d 902, 916 (D. Iowa 2001) ("There can be no 'negligent' violations of an individual's right to equal protection. . . . There is no evidence from which the court may infer that the defendants' asserted reasons for delaying the construction of a sweat lodge at the [prison] were a pretext for discrimination.").

Plaintiffs have not stated a plausible equal protection claim because their allegations do not raise a reasonable inference that any Defendant intentionally discriminated against them based on their faith. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) ("To succeed on an equal protection claim, a plaintiff in a section 1983 claim must show that officials intentionally acted in a discriminatory manner."), *abrogated on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008). The Complaint does not suggest that Plaintiffs have been intentionally targeted based on their religious beliefs. Therefore, Plaintiffs' current allegations do not state a colorable equal protection claim.

## CONCLUSION

Plaintiffs' Complaint fails to state a claim upon which relief may be granted. Plaintiffs shall have 30 days to amend their Complaint. Any amended complaint must contain all of Plaintiffs' allegations in a single pleading, and cannot rely upon or incorporate by reference prior pleadings. Dist. Idaho Loc. Civ. R. 15.1 ("Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended"); *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) ("[An] amended complaint supersedes the original, the latter

**INITIAL REVIEW ORDER - 21**

being treated thereafter as non-existent."), *overruled in part on other grounds by Lacey v.*

*Maricopa County*, 693 F.3d 896, (9th Cir. 2012) (en banc); *Hal Roach Studios, Inc. v.*

*Richard Feiner and Co., Inc*., 896 F.2d 1542, 1546 (9th Cir. 1990) (holding that the

district court erred by entering judgment against a party named in the initial complaint,

but not in the amended complaint).

      If Plaintiffs file an amended complaint, Plaintiffs must also file a "Motion to

Review the Amended Complaint." If Plaintiffs do not amend within 30 days, or if the

amendment does not comply with Rule 8, this case may be dismissed without further

notice. *See Knapp v. Hogan*, 738 F.3d 1106, 1110 (9th Cir. 2013) ("When a litigant

knowingly and repeatedly refuses to conform his pleadings to the requirements of the

Federal Rules, it is reasonable to conclude that the litigant simply *cannot* state a claim.").

**ORDER**

      **IT IS HEREBY ORDERED** that Plaintiffs shall have **30 days** from the date of

this Order to file an amended complaint as described above. If Plaintiffs choose to

amend, they must also file a motion to review the amended complaint.

DATED: December 15, 2015

B. Lynn Winmill
Chief Judge
United States District Court

**INITIAL REVIEW ORDER - 22**